UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| MELISSA MINERVA **REZA**,<br><br>                        Plaintiff,<br><br>vs.<br><br>ANDREW M. SAUL, Commissioner of<br>the Social Security Administration,<br><br>                        Defendant. | 4:19-CV-04124-VLD<br><br>AMENDED<br>MEMORANDUM OPINION<br>AND ORDER |

**INTRODUCTION**

Plaintiff, Melissa Minerva Reza, seeks judicial review of the Commissioner's final decision denying her application for social security disability and supplemental security income disability benefits under Title II and Title XVI of the Social Security Act.[1]

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits. Receipt of both forms of benefits is dependent upon whether the claimant is disabled. The definition of disability is the same under both Titles. The difference--greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history. There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any. There are corresponding and usually identical regulations for each type of benefit. See e.g. 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI). Ms. Reza filed her application for both types of benefits. AR21, 199-211. Her coverage status for SSD benefits expired on December 31, 2016. AR21, 217. In other words, in order to be entitled to Title II benefits, Ms. Reza must prove disability on or before that date.

Ms. Reza has filed a complaint and motion to reverse the Commissioner's final decision denying her disability benefits and to remand the matter to the Social Security Administration for further proceedings. See Docket Nos. 1 and 15. The Commissioner has filed his own motion seeking affirmance of the decision at the agency level. See Docket No 17.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g). The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A.    Statement of the Case

This action arises from Ms. Reza's application for Social Security Disability ("SSDI") benefits and Supplemental Security Benefits ("SSI") with a protected filing date of March 21, 2016, alleging disability starting January 1, 2014, due to one leg being shorter with pelvic problems and headaches. AR199, 203, 241. In Reza's May 27, 2016, function report, Ms. Reza complained that the following conditions limited her ability to work: headaches; a congenital shortened right leg; pain in the pelvic area, low back and neck; asthma; and memory problems. AR262. Ms. Reza indicated that her conditions caused her problems with lifting, squatting, bending, standing,

_____

[2] These facts are recited from the parties' stipulated statement of facts (Docket 14). The court has made only minor grammatical and stylistic changes. Citations to the appeal record will be cited by "AR" followed by the page or pages.

reaching, walking, sitting, kneeling, stair climbing, memory, concentration, and following instructions. AR267. Ms. Reza did not indicate any problems with talking, hearing, seeing, completing tasks, understanding, using her hands, or getting along with others. AR267. Ms. Reza stated in the form that she tries to read to improve her memory, but she has a hard time sounding out words. AR266. Ms. Reza also stated, "I clean off on cook take care of 5yr old – walk short distance." AR263. Ms. Reza also noted that she could drive and shop in stores for food for an hour or two then her back and pelvis starts hurting. AR265. On appeal, Ms. Reza completed another disability report and indicated that she did not have any new physical or mental conditions. AR271. She indicated her headaches, lumbar and pelvic pain, and weight gain made it hard for her to get out of bed, walk long distances, or stand to do dishes. AR271. She also stated that her low back pain and headaches "ruin[ed] [her] days" and made her feel depressed. AR274. Ms. Reza stated in her application documents that she was 5 feet tall, weighted 220 pounds, and her education ended in the 8th grade in 1983. AR241-42.

Ms. Reza's claims were denied at the initial and reconsideration levels, and Ms. Reza requested an administrative hearing. AR117, 124, 131.

Ms. Reza's administrative law judge ("ALJ") hearing was held on May 1, 2018, where different counsel than current counsel represented Ms. Reza. AR36. An unfavorable decision was issued October 16, 2018, by ALJ Jeffrey Holappa. AR18.

At Step One of the evaluation, the ALJ found that Ms. Reza had not engaged in substantial gainful activity between January 1, 2014, the alleged onset of disability date, and October 16, 2018, the date of the decision. AR23. The ALJ found that Ms. Reza was insured for SSDI through December 31, 2016.

At Step Two, the ALJ found that Ms. Reza had severe impairments, including degenerative disease of the lumbar spine, congenital leg length discrepancy, obesity, and migraines. AR23. The ALJ found that each of those impairments significantly limited Ms. Reza's ability to perform basic work activities. AR23. The ALJ also found that Ms. Reza had medically determinable impairments of gastroesophageal reflux, obstructive sleep apnea, recurrent maxillary sinusitis, and an impairment of her thyroid nodules, but found they were all non-severe impairments. AR24.

At Step Three, the ALJ found that Ms. Reza did not have an impairment that meets a listing. AR24. The ALJ stated, "For a claimant to demonstrate that her impairment matches a listing, the impairment must meet all of the specific medical criteria; an impairment that manifests only some of the criteria, no matter how severely, does not qualify." AR24. The ALJ did not expressly mention migraine headaches, or obesity, or whether Ms. Reza's migraine headaches and/or obesity were medically equivalent, either separately or in combination with her other impairments, to any listing in the Step 3 evaluation. AR24.

The ALJ determined that Ms. Reza had residual functional capacity ("RFC") to:

> lift and carry 20 pounds occasionally and 10 pounds frequently. She can stand, walk, and sit for six hours in an eight-hour workday. Pushing and pulling is limited to the amounts listed. The claimant can occasionally climb ramps and stairs, but can never climb ladders or scaffolds. She can occasionally balance, stoop, kneel, crouch and crawl. The claimant is limited to occasional exposure to extreme cold and vibration. She must avoid exposure to unprotected heights or moving mechanical parts.

AR24-25.

The ALJ indicated the vocational expert testified the claimant's past work as a fast food worker, DOT 311.472-010, is classified as light, unskilled work. AR28. The ALJ found at Step Four that Ms. Reza had past relevant work as a fast food worker, DOT 311.472-010, between 2006 and 2010, citing exhibits 9D, pp. 4-5 and 4E, p. 4. AR28. Exhibit 9D, pp. 4-5 lists earnings from 2006 through 2010 from D&D Berg, LLC. AR225-26. Exhibit 4E, p. 4 is a work history report completed by Ms. Reza in which she stated she worked at Taco Johns as a "Prep Cook" from March 2006 through September 2010. AR251. The ALJ noted the vocational expert testified that an individual with claimant's RFC would be able to perform this job as generally performed. AR28. The ALJ found Ms. Reza could perform the fast food worker job as generally performed. AR28.

The ALJ also stated in the decision that he made "alternative findings for step five," which included: Ms. Reza has a limited education; Ms. Reza was able to communicate in English; transferability of job skills was not an issue because Ms. Reza's RFC and vocational profile could perform the jobs of

cashier II with 450,000 jobs in the national economy, garment sorter with 15,000 jobs in the national economy, and laundry folder with 20,000 jobs in the national economy. AR28-29. Based on the testimony of the vocational expert, the ALJ concluded Ms. Reza was not disabled at step five because she had the capacity to perform other work existing in significant numbers in the national economy. AR29.

The ALJ considered the opinions of the state agency medical consultants who found Ms. Reza was limited to light work and gave them great weight because he found they were consistent with a "comprehensive review of the medical evidence." AR27.

The ALJ stated that in according the "maximum weight" to Ms. Reza's subjective allegations of pain and weakness, claimant was limited to light work, occasional postural changes except never climbing ladders or scaffolds; occasional exposure to extreme cold and vibrations; and avoiding exposure to unprotected heights or moving mechanical parts. AR27.

The ALJ stated, "[d]espite the extensive subjective allegations, the undersigned finds that the medical evidence does not include objective findings consistent with a conclusion of substantial functional limitations." AR25. The ALJ found Ms. Reza's statements concerning the intensity, persistence and limiting effects of her symptoms were not "entirely consistent with the medical evidence and other evidence in the record for the reasons explained in the decision." AR25.

The Appeals Council denied Ms. Reza's request for review making the ALJ's decision final, and Ms. Reza timely filed this action. AR1-5, 197.

## B.    Relevant Medical Evidence (chronological order)

Ms. Reza was seen at Avera Sacred Heart Hospital emergency room on July 17, 2015, for a migraine headache. AR361. Ms. Reza had a history of migraine headaches and reported a headache in the back of her head extending to the front into her neck with associated photophobia and nausea. AR361. Physical examination revealed regular heart and lungs, intact cranial nerves, intact coordination, and no focal neurological deficits. AR361-62. Toradol and Zofran injections were given with good relief of symptoms. AR362.

Ms. Reza was seen for chiropractic care on August 15, 2015, complaining of headaches, neck pain, lumbar pain, and upper thoracic tightness/stiffness. AR467. Ms. Reza reported difficulty looking over her shoulder, and difficulty walking, bending over, getting in/out of a car, sitting, twisting, and staying asleep. AR467. Examination revealed pain/tenderness in the spine, muscle tightness and trigger points and mild to moderate reduced range of motion in the spine. AR467. Spinal adjustments and decompression through mechanical traction were administered. AR468. Ms. Reza received twelve additional chiropractic exams and treatment through October 21, 2015. AR469-92.

Ms. Reza was seen at Avera Sacred Heart Hospital emergency room on September 1, 2015, for a headache. AR363. Ms. Reza reported having a headache about every month or every other month for years. AR363. She

reported a headache in the back of her head extending to the front into her neck with associated photophobia and nausea, but noted no visual changes, numbness, tingling or any other neurological problems. AR363. She noted she has not ever seen a neurologist and is under a lot of stress lately. AR363. Physical examination showed a supple neck without adenopathy or thyromegaly; intact cranial nerves; clear lungs without any rales, rhonchi or wheezes; regular heart rate and rhythm, benign abdomen, and intact neurological functioning. AR364. Diagnostic studies showed normal blood work, normal c-reactive protein testing, normal basic metabolic panel, and no acute changes on a CT of the head. AR364. Ms. Reza was given a shot of Toradol and Phenergan and was feeling much better. AR362.

Ms. Reza was seen at the Allpoints Yankton Clinic on September 28, 2015, for chronic migraines. AR439. Ms. Reza reported a long history of migraines but recently they had become more frequent, occurring daily. AR439. Symptoms included pain in the right temporal area radiating to the back of the head and neck with phonophobia, photophobia, nausea, lightheadedness and flashes of light in vision with headaches. AR440. Ms. Reza had tried sumatriptan unsuccessfully in the past. AR440. Ms. Reza denied any weight changes, abdominal pain, unilateral motor weakness, sensory deficits or dizziness. AR440. Ms. Reza was given Toradol and Phenergan, which alleviated her symptoms. AR440. Ms. Reza also reported chronic reflux that was worsening. AR440. Examination findings were generally normal including normal respiration, which was even and unlabored,

intact cardiovascular, respiratory, neurological, and abdominal findings, and Ms. Reza also showed intact motor and sensory functioning in the upper and lower extremities.  AR440-41.  Neurological examination revealed that Ms. Reza was alert and properly oriented; answering questions appropriately; and had intact cranial nerves.  AR441.  Motor and sensory functioning were intact in the upper and lower extremities with normal deep tendon reflexes and no lateralizing neurological findings.  AR441.  The assessment was classic migraine with aura, and an MRI of the head ordered, amitriptyline prescribed, and a neurology referral given.  AR442.

A brain and stem MRI were obtained at Avera Sacred Heart Hospital on September 28, 2015, due to Ms. Reza's headaches.  AR369.  The MRI was negative for the brain but showed extensive ethmoid sinus disease and empty sella changes.  AR369.

Ms. Reza was notified by Allpoints Yankton Clinic on September 29, 2015, that her H. Pylori test was positive and medications were prescribed to treat the infection.  AR439.

Ms. Reza was seen at Yankton Surgical Associates on October 5, 2015, for abdominal pain.  AR320.  She had a prior Vertical Banded Gastroplasty and silastic ring and was found to have a staple line leak.  AR320.  Upon her review of systems, Ms. Reza reported having weight gain, but denied any back pain. AR321.  Ms. Reza had gained 45 pounds since her lowest weight and had tested positive for H. Pylori for which she was on antibiotic therapy.  AR320. Examination revealed Ms. Reza was grossly obese, but in no acute distress and

with normal gait and station. AR321. Cardiovascular functioning was normal with normal heart rate and rhythm. AR321. Ms. Reza had no abdominal distension and exhibited a well-healed, clear, dry and intact abdomen incision without any signs of hernia or infection. AR321. Percussion over the abdomen revealed dullness throughout and palpation of the abdomen showed minimal tenderness. AR321. Ms. Reza had no abdominal hernia, a normal spleen and no abdominal pain. AR321. A CT from October 7, 2015, was a negative study of the abdomen, revealed a right ovarian cyst, subtle fullness of the endocervix, and no evidence of internal hernia or masses. AR319, 322, 371.

Ms. Reza contacted the Allpoints Yankton Clinic on October 7, 2015, requesting a medication change because she felt the medication given for her migraines was not working. AR442.

Ms. Reza was seen at the Allpoints Yankton Clinic on October 9, 2015, with complaints of continued chronic migraines without relief from the prescribed medication. AR437. Ms. Reza also reported low back pain from the congenital atrophy of her right leg. AR437. Examination revealed that although she had a shorter and less developed right leg with an abnormal unsteady gait and stance due to leg discrepancy, Ms. Reza had no abnormalities in her cervical, thoracic or lumbar spine; exhibited normal cranial nerves; and demonstrated no dysfunction during her motor examination. AR437-38. The assessments were classic migraine with aura, disuse muscle atrophy of the thigh and lower leg, developmental dysplasia of the hip, and obesity. AR438. Esgic was prescribed for headaches. AR438.

Ms. Reza was seen at Yankton Surgical Associates on October 12, 2015, for follow up on CT scan results and reported continued upper abdominal pain. AR314. Her provider noted that she had been seen five years ago by a surgeon after an endoscopy revealed a break down on her staple line and gastric ulcer, but was unable to get back into the office because she lost financial aid. AR314. Her provider also noted she was almost finished with her anti-H. Pylori regimen and felt neither worse nor better. AR314. Physical examination revealed that Ms. Reza was well-nourished, grossly obese, not in any acute distress and had normal gait and station. AR315. Ms. Reza was referred to a surgeon specializing in gastric bypass and obesity surgery. AR315.

Ms. Reza was seen at Sanford Neurology on December 2, 2015, for headaches with a three-year history of headaches four times per week. AR328. Ms. Reza's headaches were located in the frontal temporal area radiating to her neck and shoulders when more severe with pounding and a usual intensity of 5-7/10, but approximately three times per month they were more severe, 10/10 with nausea, vomiting, flashes in her vision, photophobia and sonophobia. AR328. Ms. Rea would have to lie down and avoid bright lights, and had identified no triggers or associated focal deficits or altered level of responsiveness. AR328. Ms. Reza was taking four tablets of Tylenol extra strength, 500 mg, for acute headaches, and repeating with two more tablets four hours later. AR328. She was doing this four times per week. AR328. She noted she was taking no other headache medications except for occasionally trying naproxen or ibuprofen instead of Tylenol. AR328. Ms. Reza

reported her mother also had migraines and that Ms. Reza had tried chiropractic treatment the last three months without any changes in her headaches. AR328. Ms. Reza reported chronic low back pain due to a congenital leg discrepancy. AR328. She has not had any significant changes in her weight within the last year or two, but reported having a gastric bypass surgery several years ago. AR328. Review of systems revealed headaches with some light flashes during severe headaches, normal vision and hearing, no chest pain or dyspnea with normal activities, a history of asthma without any need of medication, stable weight with no bowel or bladder dysfunction, normal cognition, and no neurological deficits. AR328. Aside from a right leg that is shorter than the left, physical examination was normal with normal memory, cranial nerves, vision fields; symmetrical reflexes; and intact gait, coordination, motor functioning, and sensory functioning. AR329. The impression was chronic headaches with migraine headaches, normal neurologic exam, obesity, snoring without definite apnea, and chronic low back pain due to shorter right leg. AR329. A CT scan of the brain was negative except for incidental empty sella. AR326. A brain MRI was ordered, Maxalt was prescribed to take early during migraines, and Topamax was also prescribed at bedtime. AR329. The brain MRI was negative, but showed sinus inflammation. AR328. Ms. Reza's Maxalt prescription was not approved by insurance because she needed to try and fail Sumatriptan therapy first, so her prescription was changed to Sumatriptan. AR326-28.

Ms. Reza was seen at the Allpoints Yankton Clinic on December 15, 2015, to discuss concerns including migraines, headaches, chronic low back pain, fatigue and snoring. AR435. Ms. Reza had an MRI and CT scan for headaches that "was good" and showed no lesions, but showed some indications of sinus problems and a sinus infection. AR435-36. This exam note stated Ms. Reza's leg length discrepancy was on the left and that her headaches did not involve aura. AR436. Ms. Reza reported profound snoring with poor sleep and waking unrefreshed and was fatigued through the day. AR436. Physical examination was normal and showed that Ms. Reza ambulates in a non-antalgic fashion, had negative straight leg raising, and had intact sensation and neurovascular functioning. AR436. Her assessments included acute recurrent maxillary sinusitis, obesity due to excess calories, lower back pain, migraine headache with intractable migraine without status migrainosus, snoring loudly and tonsillitis. AR436. Her treatment plan included lumbar spine x-rays, a sleep study, ENT referral, Nasonex and Augmentin to treat the sinus infection, and diet and exercise to address obesity. AR436.

Lumbar spine x-rays were obtained at Avera Sacred Heart Hospital on December 15, 2015, that revealed mild dextro tilt or scoliosis of the lumbar spine, partial sacralization of L5, and mild disc space narrowing at L4-L5, and L5-S1. AR374.

Ms. Reza was seen at AMG Ear Nose and Throat Yankton on December 21, 2015, for enlarged tonsils. AR339. Ms. Reza also complained of headaches

and a sinus infection, but denied any pain.  AR339.  Physical examination was normal with no enlarged tonsils.  AR341.  The assessment was chronic sinusitis and pharyngitis.  AR341.

Ms. Reza was seen at Avera Sacred Heart Hospital for a physical therapy initial evaluation on January 4, 2016, due to leg length discrepancy and asymmetrical muscle engagement contributing to back pain with intermittent radiation to her legs.  AR376.  Ms. Reza reported the low back pain and pelvic pain had been present for many years, but was progressing.  AR376.  Ms. Reza reported that a birth defect caused her right side to be smaller and shorter. AR376.  She said symptoms increased with sweeping or mopping, descending stairs, and standing or sitting for prolonged periods.  AR376.  Ms. Reza had treated with chiropractic treatments without lasting relief.  AR376.  She had attempted to walk for exercise but it caused pain across her low back and right hip.  AR376.  Ms. Reza had a 1.5-inch heel lift in her right shoe, which did not provide much relief to her back.  AR376.  She had a history of sinusitis and 3 or 4 migraine headaches per week.  AR377.  Examination revealed good coordination and active range of motion bilaterally in the ankles and left knee; pain in the right buttock that limits active and passive knee extension while sitting; positive neural tension with active dorsiflexion of the right ankle; and functional, but not formally tested, active and passive ranges of motion in the hips.  AR377.  Ms. Reza also had limited ability to reverse her lumbar lordosis with seated forward bending and increased sacrum discomfort all the way up to the thoracic spine with seated forward bending, struggled with maintaining

body position when attempting closed chain stabilization activities relying on the right leg compared to the left leg, had definite atrophy of the right leg muscles versus left, was obese with increased lumbar lordosis, had an elevated left pelvis, intermittent tingling in the right lower extremity and was able to ambulate without assistive devices but has antalgic gait. AR377. The assessment was low back pain which seemed mechanical in nature with signs of tightness in the right hamstring versus left that may be due to leg length discrepancy, and difference in muscle mass of the right compared to the left. AR378. Up to twenty-four PT sessions were planned. AR378.

Ms. Reza was seen at AMG Ear Nose and Throat Yankton on January 5, 2016, to review her CT scan, and she reported more of a pounding headache when she wakes. AR343. Ms. Reza weighed 223 pounds, was 5 feet tall with a BMI of 43.6 and reported no pain or safety concerns. AR343. The CT scan revealed a septal deviation, enlarged turbinates, and scant pockets of mucosal inflammation throughout her sinuses. AR345. Examination of Ms. Reza's ears, nose and throat was normal aside from some mild to moderate sinus tenderness, moderate septal deviation, and a grossly inflamed mucosa. AR344. Minimally invasive sinus surgery was planned. AR345.

Ms. Reza was seen at the AMG Ear Nose and Throat Yankton on February 10, 2016, for a one-month post-surgery check and she reported that she was stuffy and continued to have headaches, but reported no pain or safety concerns. AR349. Ms. Reza noted that she was breathing much better through her nose after her sinus surgery, no longer had dry mouth at night,

and was sleeping better at night. AR350. She continued to have frontal headaches with some pain and pressure between the eyes that had not significantly changed. AR350. Physical examination was normal with no areas of tenderness, a nice midline septum, very nicely reduced inferior turbinates, mildly inflamed mucosa, and no gross discharge. AR350. The doctor's assessment was postoperative check after sinus surgery, doing well. AR350. The doctor felt Ms. Reza's ongoing headaches may be caused by issues other than her sinuses. AR351.

Ms. Reza was seen at Sanford Neurology on March 3, 2016, to follow-up on her headaches. AR326. Ms. Reza reported a significant decrease in the number of migraine headaches but still had daily pressure headaches, and she had sinus surgery on January 4, 2016, which resolved her sinus pain. AR326. Ms. Reza was advised to gradually reduce use of acetaminophen due to possible rebound headaches; meloxicam was prescribed and Topamax and Sumatriptan continued. AR326. Her review of systems showed improved migraines, normal hearing and vision, stable weight, and normal sleep. AR326. Physical examination was normal with normal speech and memory, intact cranial nerves, normal visual fields, intact coordination and gait, and normal motor and sensory functioning. AR326. Ms. Reza was assessed with migraine headache improved on Topamax with no side effects; chronic daily headaches, pressure-type, with the possibility of analgesic rebound headache due to excessive use of acetaminophen; and normal neurological exam. AR326.

Ms. Reza was seen at the Avera Sacred Heart Hospital emergency room on March 31, 2016, for a bifrontal and pounding headache, sore throat and myalgias. AR411. She reported the headache was similar in quality to her typical migraines but worse in intensity. AR411. Physical examination was normal with no tenderness in the back or extremities, intact neurological functioning, 5/5 strength throughout, and normal affect. AR411. Ms. Reza reported feeling better after the emergency room staff administered medication to her. AR411.

Ms. Reza was seen at AMG Ear Nose and Throat Yankton on April 18, 2016, to follow-up post sinus surgery and reported significantly improved nasal breathing and fewer headaches with only one minor headache since her surgery and one very mild respiratory infection. AR352, 354. Ms. Reza reported ongoing sleep problems and a sleep study was ordered that revealed mild obstructive sleep apnea. AR358, 415. Physical examination was normal except for a mildly erythematous and tender right ear with some irritation. AR354. The doctor recommended she focus on positional sleep and employ weight reduction therapy as a means to improve her sleep disorder. AR358.

Ms. Reza was seen at the Allpoints Yankton Clinic on October 7, 2016, for migraine headaches, increased back pain and right-side pain. AR518. Ms. Reza complained that her headaches were located in the bilateral temple area and were occurring daily and lasting all day, and her Sumatriptan, Meloxicam and Topamax medications were not helping. AR518. She also noted that her low back pain did not radiate, but worsened by being upright or

walking.  AR518.  Ms. Reza also reported joint pain the last 4-5 months in her shoulders, hips, knees, ankles and hands.  AR518.  Examination revealed Ms. Reza weighed 232 pounds, BMI 43.9, back tenderness to palpation over entire lumbar spine, decreased range of motion of the lumber spine with forward, backward and lateral bends, positive straight leg raising test bilaterally, but normal respiratory, cardiovascular and neurological functioning.  AR519.  The assessments were upper back pain, obesity, classic migraine with aura, disuse muscle atrophy of the thigh and lower leg, developmental dysplasia of the hip, chronic reflux, and abdominal pain. AR529.  A Toradol injection was given, blood tests ordered, and neurology follow-up for migraines, a shoe wedge and weight loss were recommended. AR520.

Ms. Reza was seen at the Allpoints Yankton Clinic on December 8, 2016, for back pain, headaches three days per week, and right-side pain.  AR516. Ms. Reza requested a pain shot for her back, reporting that the last shot had lasted until November.  AR517.  She also wanted an order to go to the wellness center.  AR517.  Examination revealed Ms. Reza weighed 235 pounds, BMI 44.3, back tenderness to palpation over entire lumber spine, decreased range of motion of the lumber spine with forward, backward and lateral bends, and positive straight leg raising test bilaterally, but normal respiratory, cardiovascular and neurological functioning.  AR517.  Another Toradol injection was given and Ms. Reza was scheduled with podiatry and set up with

the Avera Pain Clinic due to her back pain and migraine headache pain. AR518.

Ms. Reza was seen at the Allpoints Yankton Clinic on January 18, 2017, complaining of a bad taste in her mouth, numbness in the left side of her tongue and top of her mouth, blurry vision in her left eye, trouble speaking, and a headache that started three days earlier but was now gone. AR515. Ms. Reza's hand strength tested greater on the right than left and her tongue was initially noted as deviated to the left. AR515. Review of systems showed no sinus pain; no cardiovascular, pulmonary, or gastrointestinal symptoms; no arthralgia or soft tissue swelling in the musculoskeletal system; no speech difficulties; and no motor disturbances. AR515. Examination revealed a soft and supple neck with normal range of motion; normal cardiovascular and respiratory functioning; proper orientation; left eyelid weakness, left facial droop, left side eyebrow weakness, unilateral tongue weakness and deviation to the left, unable to puff the left cheek, and left-hand grip weakness. AR516. Examination also revealed shoulder shrug within normal limitations with no weakness; bilateral intact strength in the lower extremities; intact deep tendon reflexes; normal gait and stance with no coordination or cerebellum abnormalities; and normal mental status examination. AR516. Ms. Reza's assessments were left hemiparesis, classic migraine with aura with intractable migraine with status migrainosus, and obesity. AR516. A Toradol injection was given, and blood tests, ECG, venipuncture, head CT scan and neurology consult were planned. AR516. The labs, CT, and EKG were all normal.

AR516.  The nurse practitioner and the physician felt Ms. Reza most likely was suffering neurologic symptoms due to intractable migraine.  AR516.

On January 26, 2017, prednisone was prescribed for four days.  AR514. There is no related treatment note in the appeal record.

On February 16, 2017, Dr. Matos, the neurologist, called the Allpoints Clinic during Ms. Reza's neurology appointment to report Ms. Reza has elevated blood pressure and a headache.  AR514.  This neurology treatment note from Dr. Matos does not appear in the appeal record.  AR514.

Ms. Reza was seen at the Allpoints Yankton Clinic on March 14, 2017, to follow-up on her blood pressure and sinus congestion.  AR512.  The treatment notes state that Ms. Reza saw her neurologist last month and Dr. Matos recommended hypertension medication to prevent migraine triggers from elevated blood pressure.  AR513.  Ms. Reza also reported that she received an epidural injection the prior month and her back pain improved significantly. AR513.  There is no medical record of Ms. Reza being given an epidural injection in the appeal record.

Ms. Reza was seen at the Allpoints Yankton Clinic on March 21, 2017, to follow-up on her blood pressure and a headache that day.  AR511.  Ms. Reza reported no systematic problems and noted that she was not feeling tired or poorly.  AR512.  Although she complained of a headache, Ms. Reza denied any sinus pain, musculoskeletal  symptoms or neurological symptoms.  AR512. Physical examination revealed normal range of motion in the neck; normal left ear; improved right ear; no tenderness over sinuses; and intact cardiovascular,

pulmonary and neurological functioning. AR512. Ms. Reza was alert, awake, responding to questions appropriately, and properly oriented. AR512. Ms. Reza's blood pressure medication was increased and when she was seen again in the morning of March 29, 2017, her blood pressure was much better. AR510-11.

Ms. Reza was seen again, later in the day, at the Allpoints Yankton Clinic on March 29, 2017, for a worsening migraine with photophobia, unimproved with her normal medications. AR510. She noted she had received injections in the past that had been helpful. AR510. She denied nausea and vomiting and had much improved blood pressure on Lisinopril. AR510. On examination, Ms. Reza was properly oriented, had intact cranial nerves, and answered questions appropriately. AR510. Ms. Reza was given a Toradol injection. AR510.

Ms. Reza was seen at the Allpoints Yankton Clinic on April 26, 2017, for a migraine headache with sensitivity to light and sound and without relief after taking two of her migraine medications. AR509. She reported the migraine had been worsening for the past three days. AR509. Ms. Reza reported that her neurologist was planning to do a spinal tap, but not until she sees an ophthalmologist. AR509. She denied feeling poorly and denied any vomiting or neurological symptoms. AR509. A Toradol injection was given. AR509. Physical examination revealed even and unlabored respirations with normal bilateral breath sounds; regular heart rate and rhythm with no audible murmurs, gallops, or rubs; proper orientation; intact cranial nerves; intact

motor and sensory functioning in the upper and lower extremities; and symmetrical grip strength. AR509.

Ms. Reza was seen at the Allpoints Yankton Clinic on September 14, 2017, for a migraine headache with numbness in her left upper lip, unimproved after taking oxycodone, but without any facial weakness or other neurological deficits and a watery left eye and hemorrhage in the conjunctiva with no pain or changes in vision. AR507. Ms. Reza reported that she had been scheduled to see Dr. Matos, her neurologist, on October 19, 2017, but the neurology clinic cancelled her appointment and it had not been rescheduled. AR507. Physical examination revealed even and unlabored respirations with normal bilateral breath sounds; regular heart rate and rhythm with no audible murmurs, gallops or rubs; normal neurological functioning with proper orientation, ability to answer questions appropriately, and intact cranial nerves; intact motor and sensory functioning in the upper and lower extremities; and normal deep tendon reflexes. AR508. A Toradol injection was given. AR508. Dr. Matos' office was contacted and he recommended a brain MRI which was obtained; the treatment note stated it showed no intracranial hemorrhage or lesion. AR508.

Ms. Reza was seen at the Yankton Community Health Center on November 15, 2017, for a Toradol injection for a migraine, intractable, without status migrainosus. AR495. Depression screening revealed a PHQ-9 score of 3 indicating minimal depression. AR495.

Ms. Reza was seen at the Yankton Community Health Center on February 1, 2018, for a pre-procedure physical before getting a breast biopsy. AR500. Physical examination was normal. AR500. Ms. Reza was assessed as a healthy adult on routine physical examination. AR500-01.

Ms. Reza was seen at the Yankton Community Health Center on February 8, 2018, for an injection and complaints of a migraine headache. AR505. Ms. Reza was assessed with migraine, unspecified, intractable, without status migrainosus and received a Toradol injection. AR505. After 30 minutes, Ms. Reza reported partial relief and was able to leave unassisted. AR505. Ms. Reza's medications being taken at that time were Lisinopril, Omeprazole, Sumatriptan, Topiramate, Sucralfate, Nasonex, Proventil, Gabapentin, Tizanidine, and Oxycodone. AR505.

## C.    State Agency Assessments

On June 30, 2016, Doug Soule, Ph.D., reviewed Ms. Reza's medical records and assessed Ms. Reza's mental capacity. AR73. Dr. Soule noted Ms. Reza alleged that she cannot remember well and forgets a lot, but her function report shows that she cares for a grandchild, cooks daily, does laundry, cleans, mops, and sweeps for five hours a day. AR73. She also goes outside twice a day except in winter, goes out alone, and shops in stores for groceries. AR73. Dr. Soule noted Ms. Reza has been seen for several neurological examinations that all show normal memory, mental status and speech. AR73. He determined the neurological examinations on file do not show the existence of a mental impairment.

On July 12, 2016, state agency medical consultant Judy Heller, M.D., at the initial level found there was insufficient evidence in the file to make a medical assessment for the period prior to September 28, 2015. AR72. The medical consultant at the reconsideration level made the same finding of insufficient evidence prior to September 28, 2015. AR100.

Dr. Heller opined Ms. Reza has severe impairments of dysfunction of major joints and obesity, and non-severe impairments of spine disorders and migraines. AR73. Dr. Heller noted "Physical Exams do not show any impairment to gait has been seen for headaches and sinuses. Neuro exams are normal. No mention of pelvis problems." AR74. Dr. Heller assessed an RFC for September 18, 2015, until present that Ms. Reza could perform light work except frequent climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling, but never climbing ladders, ropes or scaffolds. AR74-75. Dr. Heller also found Ms. Reza did not have any manipulative, visual, or communicative limitations, but should avoid moderate exposure to hazards and avoid concentrated exposure to extreme cold and vibrations. AR75. Robin Carter-Visscher, Ph.D., the medical consultant at the reconsideration level, independently reviewed Ms. Reza's medical records on December 21, 2016, and made essentially identical comments and findings. AR98-102.

**D. Testimony at the ALJ Hearing**

**1. Ms. Reza's Testimony**

Ms. Reza testified she was 5 feet tall and weighed 232 pounds, and that her formal education ended in the 8th grade. AR41-42. Ms. Reza testified she

attempted to obtain her GED but failed.  AR42.  Ms. Reza testified she tries to read but has a hard time with bigger words, and doesn't know her fractions. AR55.

Ms. Reza testified she last worked as a cook in January, 2014.  AR42. Ms. Reza testified she had also worked as a dishwasher, janitor, and part-time as a cashier and at Taco Johns.  AR43-44.  Ms. Reza testified she was injured at her last job, and then put on so much weight and started having headaches that turned into migraines, and her lower back prevented her from standing and walking like she should or exercising.  AR45.

Ms. Reza testified she had lower back pain that hurts constantly, makes it hard to get out of bed, causes a sharp pain that runs down her legs and butt bone.  AR45-46.  She said her back pain is 6/10 at best with medication. AR46.  Ms. Reza testified she feels pain when standing to do the dishes for only 10 or 15 minutes, and can walk two blocks but then rests because her back and sometimes her knees hurt.  AR46-47.  She said it was related to something being "uneven" and being so overweight.  AR47.  Ms. Reza said she could sit about an hour before it hurts, and lift about five or ten pounds.  AR47-48. Ms. Reza testified she took pain medication, had physical therapy, exercises she learned at physical therapy, stretches, tries walking, and gets injections every three months which she said were not as effective as they had been. AR48-49.

## 2.     Vocational Expert Testimony

The vocation expert ("VE") testified that Ms. Reza's work as a fast food cook was DOT# 313.374-010, a medium exertion, skilled job.  AR59.  The VE testified that Ms. Reza's work as a fast food worker was DOT# 311.472-010, a light-exertion, unskilled job.  AR60.

The ALJ asked the VE a hypothetical question that mirrored the limitations included in the RFC determined by the ALJ and the VE testified that the individual would be able to perform the past work of a fast food worker and a cashier, and the work of a cashier II, DOT #211.462-010, garment sorter, DOT# 222.687-014, and laundry folder, DOT# 369.687-018.  AR61.

The VE testified that if an individual missed work two or more days per month or if they needed to be off task more than 15% of a workday for any reason, they would not be capable of competitive employment.  AR62.

The VE testified the VE's testimony was consistent with the Dictionary of Occupational Titles ("DOT") as far as the physical and mental demands as well as the skill levels of work.  AR62.

## DISCUSSION

## A.     Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); <u>Biestek v. Berryhill</u>, 587 U.S. ___, 139 S. Ct. 1148, 1154 (2019); <u>Minor v. Astrue</u>, 574 F.3d 625, 627 (8th Cir. 2009). Substantial evidence is defined as more than a mere scintilla, less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support the Commissioner's conclusion. <u>Biestek</u>, 139 S. Ct. at 1154; <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Klug v. Weinberger</u>, 514 F.2d 423, 425 (8th Cir. 1975). "This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." <u>Scott ex rel. Scott v. Astrue</u>, 529 F.3d 818, 821 (8th Cir. 2008) (cleaned up).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. <u>Minor</u>, 574 F.3d at 627. The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision. <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005); <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed. <u>Oberst v. Shalala</u>, 2 F.3d 249, 250 (8th Cir. 1993). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." <u>Mittlestedt v. Apfel</u>, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether

the ALJ applied an erroneous legal standard in the disability analysis.

Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998)(citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311.

## B.     The Disability Determination and the Five-Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505.[3] The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. The five steps are as follows:

**Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the applicant is engaged in substantial gainful activity, he is not disabled and the inquiry ends at this step.

---

[3] Although Ms. Reza has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only the regulations applicable to Title II where the corresponding Title XVI regulation is identical. It is understood that both Titles are applicable to Ms. Reza's application. Any divergence between the regulations for either Title will be noted.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e. whether any of the applicant's impairments or combination of impairments significantly limit his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460, (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment* the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe)* to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 1520(f).

**C.    Burden of Proof**

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at step five.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long-standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."  Stormo v. Barnhart 377 F.3d 801, 806 (8th Cir. 2004).

**D.    The Parties' Positions**

Ms. Reza asserts the Commissioner erred in two ways: (1) the RFC determined by the Commissioner is not supported by substantial evidence;[4] and (2) the Commissioner failed to properly evaluate Ms. Reza's allegations of subjective symptoms.

The Commissioner asserts the ALJ's decision is supported by substantial evidence in the record and the decision should be affirmed.  Ms. Reza's assignments of error are discussed below.

_____

[4] This assignment of error is divided into two sub-parts.

**1.    Whether the RFC Formulation is Supported by Substantial Evidence**

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).   "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are not severe.  Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p 1996 WL 374184 (July 2, 1996).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[5]  Lauer, 245 F.3d at 703 (citations

---

[5] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  See SSR 96-8p.

omitted) (emphasis added). Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions." SSR 96-8p. If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." Id. "Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." Id.

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ. Id. at n. 8. Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. Id. However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that

functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence. . .  In assessing RFC, the adjudicator must . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

"[T]o find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

While it is true that the ALJ is free to formulate the RFC from all the evidence including the opinion evidence and the medical records, it is also established law that the ALJ may not substitute its own opinions for those of the physician. Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008), nor may the ALJ "play doctor" or rely on its own interpretation of the meaning of the medical records. Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009).

These principles were reaffirmed in <u>Combs v. Berryhill</u>, 878 F.3d 642, 647 (8th Cir. 2017). In <u>Combs</u>, the claimant alleged disability as a result of combined impairments of rheumatoid arthritis, osteoarthritis, asthma, and obesity. <u>Id.</u> at 643. The only medical opinions in the file regarding Ms. Combs' RFC were from two state agency physicians who had never treated or examined Ms. Combs. <u>Id.</u> at 644. Those physicians instead based their opinions on their review of Ms. Combs' medical records. They gave differing opinions as to Ms. Combs' RFC (one opined she was capable of light duty work, while the other opined she was capable of only sedentary work). <u>Id.</u> at 645.

In deciding which opinion to credit, the ALJ found Ms. Combs' subjective complaints not entirely credible based upon the ALJ's own review of her medical records and notations therein which indicated she was in "no acute distress" and that she had "normal movement of all extremities." <u>Id.</u> The state agency physicians apparently did not base their opinions on these observations. Ms. Combs asserted the ALJ should have contacted the physicians for clarification of what the notations meant rather than rely upon its own inferences. <u>Id.</u> at 646.

The Eighth Circuit agreed, concluding the ALJ erred by relying on its own inferences as to the relevance of the two phrases "no acute distress" and "normal movement of all extremities" as it was significant to her conditions. <u>Id.</u> at 647. The court found the relevance of these medical terms was not clear in terms of Ms. Combs' ability to function in the workplace, because her medical providers also consistently noted in their treatment records that she was had

rheumatoid arthritis, prescribed medication for severe pain, and noted trigger point and joint pain with range of motion.  Id.  So, by relying on its own interpretation of "no acute distress" and "normal movement of all extremities," in terms of Ms. Combs' RFC, the ALJ failed to fulfill his duty to fully develop the record.  Id.

Additionally, SSR 96-8p instructs ALJs how to determine RFC and how to explain their determinations.  That ruling contains requirements for the ALJ's narrative discussion.  One of those requirements is that the RFC assessment must "include a resolution of any inconsistencies in the evidence as a whole . . ."  Id. at p. 13.  Another is that "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  Id. at p. 14.

The ALJ formulated Mr. Reza's RFC as follows:

> The claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently.  She can stand walk and sit for about 6 hours in an 8-hour workday. She is able to sit for 6 hours in an 8-hour workday. Pushing and pulling is limited to the amounts listed.  The claimant can occasionally climb ramps and stairs, but can never climb ladders or scaffolds.  She can occasionally balance, stoop, kneel, crouch and crawl.  The claimant is limited to occasional exposure to extreme cold and vibration. She must avoid exposure to unprotected heights or moving mechanical parts.

AR24-25.  Ms. Reza asserts the ALJ's formulation of her RFC is not supported by substantial evidence for two reasons, discussed below.

### a.     Migraine Impairment

The ALJ found Ms. Reza's migraine headaches constituted a severe

impairment at Step 2 of the sequential analysis.  AR23.  The ALJ specifically

found Ms. Reza's migraines "significantly limit" her ability to perform basic

work activities.  Id.  Ms. Reza asserts, however, that when formulating the RFC

at Step 4 and when articulating the hypothetical to the vocational expert (VE),

the ALJ did not include any limitations (i.e. required breaks, absences from the

workplace, or difficulty concentrating or staying on task) which should have

appeared in the RFC to account for this severe impairment or its effect upon

Ms. Reza's ability to function in the workplace.

In the portion of the ALJ's opinion where it discussed the formulation of

the RFC, the ALJ discussed Ms. Reza's migraine headaches at some length.

AR25-26.  The discussion consisted of the ALJ's recitation of the following

medical evidence/treatment Ms. Reza received for her migraines/headaches:

> Ms. Reza sought emergent care for her migraines and associated
> photophobia, phonophobia, and nausea in July, 2015, and
> September, 2015.  AR26 [citing AR361, 363 which are Yankton
> Avera Sacred Heart ER records].[6]  Computer tomography showed
> empty sella, but the radiologist noted this was usually an
> incidental finding.  [AR365].  Ms. Reza received Toradol,
> Phenergan, and Zofran, and was referred to a neurologist.
> [AR364].  She was discharged to home that same day (September
> 1, 2015).  [AR364].  On September 28, 2015, she reported
> symptom relief with medication.  [AR440].  In October, 2015,
> Ms. Reza reported continued migraines associated with aura,
> photophobia and phonophobia.  [AR437].  She was prescribed
> Fioricet.  [AR438].

---

[6] In its opinion, the ALJ cited to the Exhibit numbers within the administrative
record.  For the sake of simplicity and continuity, the court has translated
those references to the exact page numbers of the administrative record rather
than the Exhibit numbers.

In December, 2015, Ms. Reza was again examined by a neurologist for migraines. [AR326, 328]. She reported taking extra-strength Tylenol for headaches eight times a week. [AR326, 328]. Magnetic resonance imaging showed empty sella changes, but otherwise no remarkable findings. [AR369, 373]. She was instructed to reduce her Tylenol use because of the possibility of analgesic rebound headaches, and she was prescribed Topamax and sumatriptan. [AR326, 329]. On March 3, 2016, Ms. Reza reported decreased migraines on the medications, but explained she continued to experience daily pressure headaches. [AR326].

On that same date, Ms. Reza reported continued headaches, but neurological exams were unremarkable. Id. In March, 2016, Ms. Reza was prescribed meloxicam for daily headaches. Id. On March 31, 2016, Ms. Reza sought emergent care for a headache. [AR411-12]. She was discharged the same day with a prescription of Compazine. Id. On April 18, 2016, she reported fewer headaches in response to treatment. [AR354]. In October, 2016, he continued to report headaches, but stated she had not followed up with her neurologist. [AR518]. Computed tomography of the brain on January 18, 2017, was unremarkable. [AR543].

On February 16, 2017, Ms. Reza sought treatment for a headache associated with some facial numbness. [AR514-15]. Physical exam showed left-sided facial droop, weakness in the left eyebrow, tongue, and cheek, and weak grip strength on the left. [AR516]. The provider found Ms. Reza exhibited neurologic symptoms associated with intractable migraine. Id. She was administered a Toradol injection. Id. Ms. Reza received four more Toradol injections between March 29, 2017, and February 8, 2018. [AR510, 509, 508, 505].

AR26-27.

The ALJ acknowledged, therefore, that Ms. Reza sought periodic treatment for her migraine headaches, even into 2018. Though she usually reported that the treatment was effective, it was not long-lasting. Ms. Reza also testified at the administrative hearing about her headaches. AR50-51. She stated she gets a headache "every day." AR50. She said the fluorescent lights in the hearing room made her eyes water. Id. She mostly has headaches in

her temples, but if she does not take medication for those headaches, they develop into a migraine. Id. If she takes the medication, the daily headache does not develop into a migraine. Id. If she takes the medication, the headache in her temples will go away. Id. This takes between a half-hour and an hour. AR50-51. Ms. Reza has not identified a trigger for the headaches; they are random. AR51. Despite her testimony that the medication she takes at the onset of a headache can stop a migraine from occurring, Ms. Reza also testified she gets more migraine headaches now than in the past. AR57. Neither the ALJ nor Ms. Reza's counsel asked her during the administrative hearing to quantify the frequency of her migraine headaches at that time, or the effect her non-migraine but daily headaches had upon her ability to function.

The Commissioner argues no limitations from Ms. Reza's headaches are warranted in the RFC and that Ms. Reza herself has failed to provide a sufficient explanation for which limitations should have been included but were not, citing Buford v. Colvin, 824 F.3d 793, 796 (8th Cir. 2016), for the general proposition that it is the claimant's burden to prove the limitations of her RFC. So, the Commissioner asserts, the ALJ committed no error by failing to specifically connect Ms. Reza's migraines/headaches with any limitation in the RFC. This conclusion cannot be discerned, however, from the ALJ's written decision.

The ALJ's recitation of Ms. Reza's RFC (recited verbatim above on pages 36-37 of this opinion) did not include any mention of how Ms. Reza's functional

capacity was affected by limitations presented by her headaches or, if the ALJ determined none were necessary (as the Commissioner argues), why not.

Because the ALJ's own written decision specifically stated Ms. Reza's migraine headaches were a severe medically determinable impairment that significantly limited her ability to perform basic work activities, the ALJ was required to consider the effects of the headaches when formulating her RFC. The Commissioner's states in his brief that there was insufficient evidence in the record to support a finding that Ms. Reza's headaches significantly limited her ability to perform basic work activities; instead, the migraines caused *no* limitations.

There are two problems with the Commissioner's argument. First, it is directly contrary to the specific statement made by the ALJ in its written decision. Second, it is a *post hoc* argument. See <u>Burlington Truck Lines, Inc.</u> <u>v. United States</u>, 371 U.S. 156, 168–69 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action; ... an agency's discretionary order [may] be upheld, if at all, on the same basis articulated in the order by the agency itself.").

The court is left to speculate about why there is no mention of the effect that Ms. Reza's severe impairment of migraine headaches have upon her ability to work. <u>Nicola v. Astrue</u>, 480 F.3d 885, 887 (8th Cir. 2007); <u>Parker-Grose v.</u> <u>Astrue</u>, 462 Fed. Appx. 16 (2d Cir. 2012) (Commissioner's assertion that failure to find mental impairment severe at step two was harmless was "unavailing" because "having found that any functional limitations associated with

[claimant's] mental impairment were mild and only minimally affected her capacity to work, the ALJ did not take these restrictions into account when determining her [RFC]." This case must be remanded for clarification of this issue. Only then can this court sufficiently review the Commissioner's decision.

### b. Medical Opinion Evidence

Medical opinions are considered evidence which the ALJ will consider in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC. See 20 C.F.R. § 404.1527. All medical opinions are evaluated according to the same criteria, namely:

--whether the opinion is consistent with other evidence in the record;

--whether the opinion is internally consistent;

--whether the person giving the medical opinion examined the claimant;

--whether the person giving the medical opinion treated the claimant;

--the length of the treating relationship;

--the frequency of examinations performed;

--whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;

--the degree to which a nonexamining or nontreating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

--whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

--whether any other factors exist to support or contradict the opinion.

See 20 C.F.R. § 404.1527(c)(1)-(6); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

"A treating physician's opinion is given controlling weight 'if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.' " House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (quoting Reed, 399 F.3d at 920); 20 C.F.R. § 404.1527(c). "A treating physician's opinion 'do[es] not automatically control, since the record must be evaluated as a whole.' " Reed, 399 F.3d at 920 (quoting Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)). The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 404.1527(c). "[I]f 'the treating physician evidence is itself inconsistent,' " this is one factor that can support an ALJ's decision to discount or even disregard a treating physician's opinion. House, 500 F.3d at 744 (quoting Bentley, 52 F.3d at 786; and citing Wagner, 499 F.3d at 853-854; Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005)). "The opinion of an acceptable medical source who has examined a claimant is entitled to more weight than the opinion of a source who has not examined a claimant." Lacroix v. Barnhart, 465 F.3d 881, 888 (8th Cir. 2006) (citing 20 C.F.R. § 404.1527; Shontos v. Barnhart, 328 F.3d 418, 425 (8th Cir. 2003); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)).

When opinions of consulting physicians conflict with opinions of treating physicians, the ALJ must resolve the conflict. Wagner, 499 F.3d at 849. Generally, the opinions of non-examining, consulting physicians, standing alone, do not constitute "substantial evidence" upon the record as a whole, especially when they are contradicted by the treating physician's medical opinion. Id.; Harvey v. Barnhart, 368 F.3d 1013, 1016 (8th Cir. 2004) (citing Jenkins v. Apfel, 196 F.3d 922, 925 (8th Cir. 1999)). However, where opinions of non-examining, consulting physicians along with other evidence in the record form the basis for the ALJ's decision, such a conclusion may be supported by substantial evidence. Harvey, 368 F.3d at 1016. Also, where a nontreating physician's opinion is supported by better or more thorough medical evidence, the ALJ may credit that evaluation over a treating physician's evaluation. Flynn v. Astrue 513 F.3d 788, 792 (8th Cir. 2008)(citing Casey v. Astrue, 503 F.3d 687, 691-692 (8th Cir. 2007)). The ALJ must give "good reasons" for the weight accorded to opinions of treating physicians, whether that weight is great or small. Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008); 20 C.F.R. § 404.1527(c)(2).

Certain ultimate issues are reserved for the Agency's determination. 20 C.F.R. § 416.927(e). Any medical opinion on one of these ultimate issues is entitled to no deference because it "invades the province of the Commissioner to make the ultimate disability determination." House, 500 F.3d at 745 (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)). See 20 C.F.R. § 416.927(e)(3). The ultimate issues reserved to the Agency are as follows:

1.  whether the claimant is disabled;

2.  whether the claimant is able to be gainfully employed;

3.  whether the claimant meets or exceeds any impairment in the Listing of Impairments (appendix 1 to subpart P of part 404 of 20 C.F.R.);

4.  what the claimant's RFC is; and

5.  what the application of vocational factors should be.

See 20 C.F.R. § 416.927(e)(1) and (2); see also Wagner, 499 F.3d at 849 (the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment.") (quoting Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998)). The RFC determination is specifically noted to be one of those determinations that is an ultimate issue for the Agency to determine. 20 C.F.R. § 416.927(e)(2); Cox v. Astrue, 495 F.3d 614, 619-620 (8th Cir. 2007).

The only physicians who were asked to offer opinions about Ms. Reza's functional limitations in this case were the State agency physicians. Their opinions appear at AR95-105 and 106-16. The ALJ's discussion of the medical opinion evidence is very brief and appears at AR27. The ALJ stated, "[t]he state agency medical consultants found that the claimant was limited to light work [AR75, 112].[7] The undersigned accords these opinions great weight, as they are consistent with a comprehensive review of the medical evidence." AR27.

---

[7] Again, the ALJ referred to the Exhibit numbers found in the index of the administrative record. For ease of reference and continuity, the court has translated the ALJ's references into AR page numbers.

Ms. Reza asserts the ALJ's evaluation of the medical evidence in this case is flawed for two reasons:  First, the ALJ gave "great weight" to the opinions of the State agency physicians who had never examined or treated Ms. Reza, without sufficiently explaining why it did so.

Second, the State agency physicians whose opinions the ALJ purportedly assigned "great weight" found Ms. Reza's migraine headaches were a non-severe impairment.  Ms. Reza asserts the ALJ properly rejected that portion of the State agency physicians' findings.  But, she claims, it then had a duty to either recontact a treating source, request additional records, order a consultative exam, or ask the claimant or others for further information to identify what appropriate limitations should be included in Ms. Reza's RFC as to her severe medical impairment of migraine headaches.   The ALJ did not do so, and did not assign any associated functional limitations in the RFC, despite its specific finding that the migraine headaches "significantly limited" her ability to perform basic work activities.

The ALJ's very brief explanation was insufficient to determine whether there was good reason for the great weight assigned to the State agency physician opinions.  Generally, the opinions of non-examining, non-treating physicians, standing alone, are not enough to constitute substantial evidence in the record.  Nevland, 204 F.3d at 858; Cox v. Barnhart, 345 F.3d 606, 610 (8th Cir. 2003).  The exception to this rule is when the opinions of non-examining, non-treating physicians are supported by better or more thorough medical evidence.  Flynn 513 F.3d at 792.  Here, however, the State agency

physicians' opinions were not supported by better or more thorough—or even sufficient evidence.

The relevant time frame under consideration in this case is January 1, 2014, (Ms. Reza's alleged date of onset) through December 31, 2016, (her date last insured). The period of time under consideration, then, is three years--the entirety of 2014, the entirety of 2015, and the entirety of 2016. But both State agency physicians (Dr. Heller at the initial level and Dr. Barker at the reconsideration level) stated in their reports that there was insufficient evidence in the file to make an assessment for the period prior to September 28, 2015. AR72, 76, 100, 113. These statements appear in the "assessment" portion of the State agency reports. The physician at the initial level simply stated, "there is insufficient evidence in the file prior to 9/28/2015 to make a medical assessment." AR72. At the reconsideration level, the physician stated, "the MER[8] only goes back until 9/28/2015 event the AOD is listed as 1/1/14. There is insufficient evidence between 1/1/14 and 9/27/15 due to the lack of MER." AR113.

In other words, the physicians upon whose opinions the ALJ relied bluntly stated there was insufficient information in the file about nearly two-thirds of the time frame relevant to Ms. Reza's claim for benefits. The ALJ made no mention, however, of this admission when it adopted their opinions and gave them "great weight." See AR27. Instead, the ALJ simply concluded

---

[8] MER is an acronym often used within the Social Security Administration for "medical evidence of record."

45

the State agency physician opinions were "consistent with a comprehensive review of the medical evidence." Id.

If there was insufficient evidence in the record, the ALJ had the duty to develop the record. This is so whether Ms. Reza was represented by counsel at her administrative hearing or not. This rule is long standing and widely recognized in social security cases:

> Normally in Anglo-American legal practice, courts rely on the rigors of the adversarial process to reveal the true facts of the case. However, social security hearings are non-adversarial. Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case. The ALJ's duty to develop the record extends even to cases like Snead's, where an attorney represented the claimant at the administrative hearing. The ALJ possesses no interest in denying benefits and must act neutrally in developing the record.

Snead v. Barnhart, 360 F.3d 834, 838 (8th 2004) (citations omitted). See also Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir. 2010) (ALJ has a duty to develop the record even when claimant has counsel). If the record is insufficient to determine whether the claimant is disabled, the ALJ must develop the record by seeking additional evidence or clarification. McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011). However, this is true only for "crucial" issues. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). The ALJ may further develop the record by re-contacting a treating source, requesting additional records, ordering a consultative exam, or asking the claimant or someone else for further information. See 20 C.F.R. § 404.1520b; Freeman v. Apfel , 208 F.3d 687, 692 (8th Cir. 2000).

Likewise, the State agency physicians whose opinions the ALJ purported to adopt found her migraine headaches were a non-severe impairment. Accordingly, the State agency physicians did not assign any functional limitations to coincide with this physical impairment when they completed the RFC portion of their reports (i.e. no limitations on her ability to concentrate or that she would have frequent absences, etc.).

The ALJ disregarded that portion of the State agency physicians' opinions and instead deemed Ms. Reza's migraine headache impairment a severe impairment. Because the State agency physicians had deemed the headaches non-severe, they assigned no functional limitations associated with the headaches. But the ALJ likewise did not assign any functional limitations, even though the ALJ departed from the State agency physicians' opinions in concluding Ms. Reza's migraines were a severe impairment. This was error. The ALJ could not make up its own functional limitations because the ALJ is not a medical professional. Lauer, 245 F.3d at 704 ((RFC is a medical question; therefore, some medical evidence must support it); Shontos, 328 F.3d at 427 (ALJ must rely on some medical evidence in determining limitations within RFC, it cannot make its own medical opinions).

Because the ALJ found the impairment was severe, instead of ignoring the need for functional limitations based upon Ms. Reza's headaches it had a duty to further develop the record for the purpose of determining appropriate functional limitations. McCoy, 648 F.3d at 612; 20 C.F.R. § 404.1520b;

<u>Freeman</u>, 208 F.3d at 692.  Because the ALJ did not do this, Ms. Reza's case must be remanded for further proceedings.

### 2. Whether the Commissioner Failed to Properly Evaluate Ms. Reza's Allegations of Subjective Symptoms[9]

In determining whether to fully credit a claimant's subjective complaints of disabling pain, the Commissioner engages in a two-step process:  (1) first, is there an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms; and (2) if so, the Commissioner evaluates the claimant's description of the intensity and persistence of those symptoms to determine the extent to which the symptoms limit the claimant's ability to work.  <u>See</u> SSR 16-3p;[10] 20 C.F.R. § 404.1529.[11]  Here, the ALJ found Ms. Reza had medically determinable physical impairments that could reasonably be expected to produce her symptoms in accordance with part one above.  So, the analysis rested on the second prong discussed above.

---

[9] The court notes that as of March 28, 2016, the Commissioner determined to discontinue the use of the term "credibility" in its sub-regulatory policy.  <u>See</u> SSR 16-3p (which superseded SSR 96-7p).  The Commissioner wanted to make clear that in evaluating a claimant's subjective complaints of symptoms, it was not evaluating the claimant's character.  <u>Id.</u>  The court uses the term "credibility" herein only to the extent necessary as it is prevalent in the case law that has developed.  The ALJ in this case carefully avoided it when it stated it had accorded the "maximum weight to the claimant's subjective allegations of pain and weakness."  AR27.  Nevertheless, like the Commissioner, this court emphasizes that "credibility" is not interchangeable with "character."

[10] This Social  Security Ruling generally interprets how to evaluate symptoms in disability claims.

[11] 20 C.F.R. § 404.1529 is a rough codification of the factors discussed in <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984).

In evaluating the second prong of the analysis, an ALJ must consider several factors. The factors to consider include: whether such complaints are supported by objective medical findings, whether the claimant has refused to follow a recommended course of treatment, whether the claimant has received minimal medical treatment, whether the claimant takes only occasional pain medications, the claimant's prior work record, observation of third parties and examining physicians relating to the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Wagner, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). The objective medical evidence is not the only consideration, and the claimant's subjective complaints may not be disregarded solely because they are not supported by the objective medical evidence. Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005). A claimant's subjective complaints of pain may be discredited only if they are inconsistent with the evidence as a whole. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

With regard to the factor of a claimant's daily activities, the ALJ must consider the "quality of the daily activities and the ability to sustain activities, interest, and relate to others *over a period of time* and the frequency, appropriateness, and independence of the activities." Wagner, 499 F.3d at 852 (citing Leckenby v. Astrue, 487 F.3d 626, 634 (8th Cir. 2007)) (emphasis in original). Although activities which are inconsistent with a claimant's

testimony of disabling pain reflect negatively on the claimant's credibility, the ability to do light housework and occasional visiting with friends does not support a finding that the claimant can do full-time work in the "competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (quoting Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989)).

An ALJ need not methodically discuss every Polaski factor so long as the factors are all acknowledged and considered in arriving at a conclusion. Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008). If adequately supported, credibility findings are for the ALJ to make. Black, 143 F.3d at 386. Generally, the ALJ is in a better position to evaluate credibility of witnesses and courts on judicial review will defer to the ALJ's credibility determinations so long as they are supported by substantial evidence and good reasons. Cox, 471 F.3d at 907. See also Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004) (stating "[w]e will not substitute our opinion for that of the ALJ, who is in a better position to assess credibility.").

The Eighth Circuit has said "in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." Woolf, 3 F.3d at 1213. So too, here: there is no question Ms. Reza experienced symptoms; the real issue is how severe those symptoms are. The Polaski factors should assist the ALJ in making that determination.

Though the ALJ purported to give Ms. Reza's subjective pain complaints "maximum weight," a close reading of its decision reveals otherwise. Instead

the ALJ gave weight to *only one* of the factors found in <u>Polaski</u> and 20 C.F.R. § 404.1529—the objective medical evidence. The ALJ's discussion is found at AR25-27. The ALJ stated it had considered "other evidence" in compliance with 20 C.F.R. § 404.1529. The ALJ's discussion, however, contained no substantive analysis of any factor other than the medical evidence.

The fourth full paragraph at AR25 consists of the ALJ's summary of Ms. Reza's hearing testimony about her age, education, work history, medical treatment, and daily activities. While at first blush this may appear to be an analysis of some of the <u>Polaski</u> factors, it is merely the ALJ's description of Ms. Reza's testimony. There is no accompanying explanation from the ALJ as to why (for example) her description of her daily activities is consistent or inconsistent with her description of her subjective pain symptoms. More importantly, the last sentence of this paragraph and the first sentence of the next paragraph serve as the introduction for the remainder of the entirety of this section of the ALJ's decision. Those two sentences state:

> Despite the extensive subjective allegations, the undersigned finds that the medical evidence does not include objective findings consistent with a conclusion of substantial functional limitations. After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

AR25. The very next paragraph begins with the words "[t]he medical evidence shows. . ." <u>Id.</u> The ALJ discussed the medical expert opinions (the State

51

agency physicians) in one sentence at AR27, but not a single other Polaski factor.  AR25-27.

The Commissioner asserts the ALJ did discuss one of the other Polaski/20 C.F.R. § 404.1529 factors (namely Ms. Reza's medical treatment) before concluding her subjective allegations of pain were not entirely consistent with her stated functional limitations.  Specifically, at AR25, the ALJ noted "the medical evidence shows sporadic and conservative treatment for back pain and migraines.  The claimant did not require surgery or hospitalization, and while treatment providers noted tenderness in the back and posture asymmetry, physical examinations were generally unremarkable."  The second sentence of this statement comments upon the objective medical evidence because it notes her examinations were "unremarkable."  That leaves the first sentence— wherein the ALJ noted Ms. Reza's treatment for back pain and migraines was "sporadic and conservative."  AR25.  The ALJ, however, failed to explain how more frequent or more aggressive treatment for either Ms. Reza's spinal condition or her migraine headaches would have caused her subjective pain complaints to be better substantiated in the record.  The ALJ cited no physician's advice for more frequent or more aggressive treatment, for example, which Ms. Reza ignored or refused to follow.

At best the ALJ paid only lip service to its duty to evaluate the factors other than the objective medical evidence which are required under Polaski, 20 C.F.R. § 404.1529, and SSR 16-3p.  Though the ALJ stated it considered these factors, absent some articulation of what that consideration was, a proper

review is impossible.  Remand is required for reconsideration of Ms. Reza's subjective pain complaints.

**E.     Type of Remand**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record. Ms. Reza requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

Section 405(g) of Title 42 of the United States Code governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id. Neither sentence six situation applies here.

A sentence four remand is applicable in this case. Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding." Buckner, 213 F.3d at 1011. In the face of a finding of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings. Id.; Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated. See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability). Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby

ORDERED that the Commissioner's decision is REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four. Ms. Reza's motion to remand [Docket No. 15] is GRANTED and the Commissioner's motion to affirm [Docket No. 17] is DENIED.

DATED April 14, 2020.   BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge